454 Mass. 635 (2009)                                635

In the Matter of the Valuation of MCI WorldCom Network Services, Inc.

IN THE MATTER OF THE VALUATION OF MCI WORLDCOM NETWORK SERVICES, INC. (and sixteen companion cases).

Suffolk. March 5, 2009. - September 10, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Administrative Law,* Judicial review, Substantial evidence, Agency's interpretation of statute. *Taxation,* Appellate Tax Board: appeal to Supreme Judicial Court; Value; Assessors. *Telephone Company. Bankruptcy. Commissioner of Revenue. Statute,* Construction.

The Appellate Tax Board (board) correctly concluded, based on substantial evidence before it, including its findings regarding the credibility of expert witnesses, that two central valuations by the Commissioner of Revenue (commissioner) of certain personal property of two telephone companies were not substantially higher or substantially lower than the property's actual value [641-646]; however, in the absence of any finding that the telephone companies had met their burden of proving that a third valuation was substantially higher than the property's actual value, the board erred when it unilaterally revised that valuation by substituting its own judgment for that of the commissioner [646].

A municipality that failed to file a petition appealing from a valuation under G. L. c. 59, § 39, by the Commissioner of Revenue could not seek to secure relief in the form of an increase in that valuation. [646-648]

A limited liability company could not qualify for the corporate utility exemption contained in G. L. c. 59, § 5, Sixteenth (1) (*d*), so as to relieve it from the taxation of certain of its machinery. [648-650]

The Appellate Tax Board correctly concluded that the proper date for ascertaining the ownership status of property subject to valuation by the Commissioner of Revenue (commissioner) under G. L. c. 59, § 39, is the first day of January preceding the fiscal year for which the tax will be assessed based on the commissioner's valuation. [650-651]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*William A. Hazel* for the taxpayers.

*Richard G. Chmielinski,* Assistant City Solicitor, for Board of Assessors of Newton.

*Anthony M. Ambriano* for Board of Assessors of Boston.

*Daniel A. Shapiro*, Assistant Attorney General (*Daniel J. Hammond*, Assistant Attorney General, with him) for Commissioner of Revenue.

*Rosemary Crowley & David J. Martel*, for Massachusetts Association of Assessing Officers, amicus curiae, submitted a brief.

CORDY, J. This case presents challenges to the Commissioner of Revenue's (commissioner's) central valuations, made pursuant to G. L. c. 59, § 39 (§ 39), of the "machinery, poles, wires and underground conduits, wires and pipes" (§ 39 property) of the taxpayer telephone companies for fiscal year (FY) 2004, FY 2005, and FY 2006. In deciding those challenges, we must resolve several issues, including (1) whether the Appellate Tax Board (board) correctly upheld the commissioner's valuations for FY 2005 and FY 2006; (2) whether the board applied the wrong standard of review in modifying the commissioner's valuations for FY 2004; (3) whether a municipality must appeal from the commissioner's valuations in order to be entitled to relief under § 39; (4) whether one of the taxpayers qualifies for the corporate utility exemption under G. L. c. 59, § 5, Sixteenth, thus relieving it from the taxation of certain of its "machinery"; and (5) whether January 1, 2004, or July 1, 2004, is the proper date for determining the ownership status of property for purposes of the corporate utility exemption.

We conclude that the board properly affirmed the commissioner's valuations for FY 2005 and FY 2006, and erred in reducing the commissioner's valuations for FY 2004. We also agree with the board that a municipality must file a petition appealing from the commissioner's valuation in order to secure relief in the form of an increase in that valuation; MCI Metro Access Transmission Services, LLC (MCImetro), does not qualify for the corporate utility exemption; and the proper date for ascertaining the ownership status of § 39 property is the first day of January preceding the fiscal year for which the tax will be assessed based on the commissioner's valuation.

1. *The parties.* MCI WorldCom Network Services, Inc. (MWNS), and MCImetro (collectively, MCI taxpayers) provide "land-line" voice, broadband data transfer, and Internet services in the Commonwealth using fiber optic cables, conduits, and

electric machinery. MWNS is a long-distance telephone provider incorporated in Delaware.[1] MCImetro is a competitive local exchange company providing local telephone service. It was formed as a Delaware limited liability company in 1998 and was taxed as a division of MWNS until 2004, when it elected to be taxed as a separate corporation for Federal tax purposes. Under a Chapter 11 bankruptcy reorganization of WorldCom, Inc. (owner of MCI taxpayers), the assets of MCImetro (including the § 39 property) were transferred to Brooks Fiber Communications of Massachusetts, Inc. (Brooks).[2] The MCI taxpayers claim that this transfer occurred prior to July 1, 2004. The board of assessors for the city of Boston (Boston assessors) and the board of assessors for the city of Newton (Newton assessors) are charged with assessing taxes on § 39 property that the commissioner has valued.

2. *Background.* Each year, the commissioner is required to conduct and certify centralized valuations of the § 39 property of all telephone and telegraph companies according to a particular schedule.[3] G. L. c. 59, § 39. First, telephone companies must file a return with the commissioner by March 1 listing all of the § 39 property that the company held on January 1 of the same year. *Id.* For the years in question, the commissioner required telephone company taxpayers to file forms denoted "State Tax Form 5941" to assist with the valuation of that property.[4] By May 15, the commissioner must conduct a centralized valuation of the

---

[1]MCI WorldCom Network Services, LLC (MWNS), was incorporated in Delaware in 1973 as MCI Telecommunications Network; its name later changed to MCI WorldCom Network Services, Inc., then to MCI Network Services, Inc. It now operates under the name Verizon Business Network Services, Inc.

For Massachusetts tax purposes in 2002, 2003, and 2004, MWNS filed as a "utility corporation" using Form P.S.1. "Utility corporation" is defined as "every incorporated telephone and telegraph company subject to" G. L. c. 166, the general regulatory framework applicable to telephone companies. G. L. c. 63, § 52A, as amended through St. 2004, c. 466, § 4. MCImetro was included in MWNS's Forms P.S.1.

[2]Brooks Fiber Communications of Massachusetts, Inc., subsequently changed its name to MCI Metro Access Transmission Services of Massachusetts, Inc.

[3]The parties agree that both MWNS and MCImetro were "telephone companies" for the purposes of G. L. c. 59, § 39, valuation.

[4]State Tax Form 5941 was created by the Commissioner of Revenue (commissioner) for use in central valuations. See G. L. c. 59, § 41 ("return [for valuation of § 39 property] shall be in the form and detail prescribed by the

§ 39 property and certify that valuation to the property owners and the local boards of assessors where the property is located. *Id.* The assessors then use those valuations to assess taxes on the property owners for the fiscal year beginning July 1. G. L. c. 59, §§ 29, 38.

MWNS and MCImetro filed Form 5941 for FY 2004 and FY 2005. Additionally, MWNS filed Form 5941 for FY 2006. The inventory of both companies was based on financial accounting books that had been prepared for the United States Securities and Exchange Commission.[5] For FY 2004 and FY 2005,[6] the commissioner conducted valuations of § 39 property owned by both MWNS and MCImetro. For FY 2006, the commissioner valued only the § 39 property of MWNS because MCImetro had transferred all its § 39 property to Brooks prior to the date of the FY 2006 valuation.

The two preferred methods for conducting valuations of property are the "market study method," which compares the property at issue to similar, recently sold property, and the "income capitalization method," which calculates the present value of the income that property will produce. See *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 477 (1984); *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 362 (1978) (*Correia*). However, those methods may be unavailing "where the special character of the property makes it substantially impossible to arrive at value on the basis of capitalized net earnings or on the basis of comparable sales." *Blakeley* v. *Assessors of Boston, supra,* citing *Correia, supra* at 362-364. In such circumstances, the commissioner may use a third method: "depreciated reproduction cost" (DRC), defined as "[t]he current cost of reproducing a property less depreciation from deterioration and functional

---

commissioner and shall contain all information which he shall consider necessary"). The form used for fiscal year (FY) 2004 required less information than the FY 2005 and FY 2006 versions, because in 2004 the commissioner had not yet instituted the more detailed valuation method. See note 8, *infra.*

[5]A second set of property inventories was also maintained by the MCI taxpayers for Federal tax purposes. The companies' financial accounting books were subsequently restated to reflect WorldCom's bankruptcy proceedings and asset impairments.

[6]For the purposes of § 39, a fiscal year runs from July 1 to June 30. For example, FY 2004 began July 1, 2003, and ended June 30, 2004.

and economic obsolescence." *Correia, supra* at 362.[7] That is the method elected by the commissioner for the fiscal years at issue.

The commissioner hired consultant George E. Sansoucy to assist in the appraisal of the § 39 property using the DRC method.[8] Sansoucy first determined the theoretical cost of newly reproducing the § 39 property.[9] Next, he discounted that amount by the value of the property's physical depreciation, which he calculated using straight-line depreciation based on the Federal

[7]We have in the past noted concerns with the DRC method stemming "in major part from uncertainty in accurately measuring obsolescence and physical depreciation." *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 478 (1984), citing *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 364 (1978) (*Correia*). "There is danger . . . that evidence of reproduction cost (even if it purports to be fairly adjusted) may lead to 'an excessive [valuation] unless it is [in fact] adequately discounted for obsolescence and inadequacy as well as for physical depreciation.' " *Correia, supra*, quoting *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 148 (1967).

[8]The commissioner hired Sansoucy to evaluate the Department of Revenue's existing valuation methodology and "devise an adaptable computerized mass appraisal system" for the commissioner's application in the wake of *RCN-BecoCom, LLC* v. *Commissioner of Revenue*, 443 Mass. 198 (2005) (limited liability companies no longer qualified for corporate utility exemption in G. L. c. 59, § 5, Sixteenth [*d*]). The effect of this decision required the commissioner to value significantly more property than before.

[9]In arriving at the cost of new reproduction, Sansoucy took the original cost and "trended" it using two different published and respected indices, one for generator equipment and one for wires, conduits, and other machinery.

"The indices are composed of digits representing the relative numeric positions of current cost and are provided for historical years to the present. To use the index, the digit for a vintage year is divided by the current year digit to arrive at a factor that is applied to the original cost to determine cost new."

By applying these indices, Sansoucy calculated the costs of new reproduction for the property of the MCI taxpayers as follows:

### MWNS

|       | Boston property | Newton property |
|-------|-----------------|-----------------|
| 2004: | $3,733,960      | $1,076,684      |
| 2005: | $3,749,036      | $1,001,727      |
| 2006: | $3,845,899      | $1,082,885      |

### MCImetro

|       | Boston property | Newton property |
|-------|-----------------|-----------------|
| 2004: | $100,866,166    | $187,625        |
| 2005: | $102,943,462    | $195,651        |

640 454 Mass. 635 (2009)

In the Matter of the Valuation of MCI WorldCom Network Services, Inc.

Communication Commission's service life tables for twenty-three different categories of property.[10] Finally, he imposed a further discount by concluding that MWNS was entitled to an economic obsolescence deduction of twenty-five per cent in FY 2005 and FY 2006, and that MCImetro was entitled to that same deduction for FY 2005. For reasons explained further below, Sansoucy did not recommend, and the commissioner did not apply, a separate obsolescence deduction for FY 2004.

The MCI taxpayers appealed from those valuations to the board, arguing that the property's actual value was "substantially lower . . . than the valuation certified by the commissioner of revenue." G. L. c. 59, § 39. The Boston assessors and the Newton assessors also appealed to the board, arguing that the value of the MCI taxpayers' property in their cities was "substantially *higher* . . . than the valuation certified by the commissioner of revenue" (emphasis added). *Id.*[11] The appeals were consolidated into a single action on August 4, 2006.

In the consolidated appeal before the board, the parties submitted statements of agreed facts with exhibits, called lay and expert witnesses, introduced expert valuation reports, and filed

---

[10]"Straight line depreciation takes the expected service life of property and divides it into even yearly amounts. These amounts are the yearly depreciation deductions." Sansoucy adopted a "floor" for the valuation of the property below which further depreciation will not be taken until the property is taken out of service.

Using this method, Sansoucy calculated the value of the depreciation for each fiscal year as follows:

MWNS

|  | Boston property | Newton property |
|---|---|---|
| 2004: | $800,824 | $497,391 |
| 2005: | $996,945 | $471,571 |
| 2006: | $1,247,991 | $578,476 |

MCImetro

|  | Boston property | Newton property |
|---|---|---|
| 2004: | $25,891,126 | $88,558 |
| 2005: | $27,332,017 | $81,534 |

[11]The Boston assessors filed a petition appealing from only the FY 2005 assessment. See *infra* at 646. See also G. L. c. 58A, § 7 (party "taking an appeal to the board . . . shall file a petition . . . set[ting] forth specifically the facts" on which the party relies and its contentions of law).

posttrial briefs and reply briefs. For the purposes of this appeal, the central witnesses were Jerome Weinert (witness for MCI taxpayers, qualified as an expert in the areas of depreciation, functional obsolescence, and valuing telephone companies); Mark Rodriguez and Mark Pomykacz (witnesses for the Boston assessors and Newton assessors, qualified as experts in appraisal); and Sansoucy (witness for the commissioner, qualified as an expert in utility and telephone company personal property valuation and engineering).

In a detailed decision, the board affirmed the commissioner's valuations for FY 2005 and FY 2006; however, for FY 2004, the board required the commissioner to apply the same twenty-five per cent economic obsolescence deduction that the commissioner had applied in the later years. The board rejected other arguments made by both the taxpayers and the local assessors, as described below. MWNS filed an appeal and an application for direct appellate review, which we granted.

3. *Discussion.* In an appeal to the board of a valuation made under § 39, the appellant has the burden "of proving that the value of the machinery, poles, wires and underground conduits, wires and pipes is substantially higher or substantially lower, as the case may be, than the valuation certified by the commissioner of revenue." G. L. c. 59, § 39. "Our review of a board decision is limited to questions of law." *Bell Atl. Mobile of Mass. Corp., Ltd.* v. *Commissioner of Revenue*, 451 Mass. 280, 283 (2008) (*Bell Atl.*), citing *Towle* v. *Commissioner of Revenue*, 397 Mass. 599, 601 (1986). "We will not disturb the board's findings so long as they are supported by substantial evidence and a correct application of the law." *Bell Atl., supra,* citing *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 555 (1993). Although the interpretation of statutes is a question of law that we resolve, the board's interpretation of tax statutes "may be given weight by this court" because it is an agency charged with the administration of tax law. *Bell Atl., supra,* quoting *Commissioner of Revenue* v. *McGraw-Hill, Inc.*, 383 Mass. 397, 401 (1981).

a. *Economic obsolescence deduction.* In their appeal to this court, the appellants do not contest the commissioner's estimates of the new reproduction costs or the discount for physical depreciation of their § 39 property; rather, they contend that the commissioner applied an incorrect "economic obsolescence" deduction.

In the proceedings before the board, Sansoucy testified that he attempted to determine a proper economic obsolescence deduction in light of claims by some telephone companies that technological advances had rendered some property, like fiber optic cables, less valuable. Using a sample property spreadsheet that estimated economic obsolescence depreciations of five per cent to seventy per cent (depending on age of property),[12] and using information gleaned from discussions with industry representatives, Sansoucy determined that a proper weighted obsolescence deduction for all telephone companies was twenty-five per cent. As noted, that twenty-five per cent economic obsolescence deduction was then applied to the MCI taxpayers' property in 2005 and 2006.[13]

The economic obsolescence deduction was not applied in the same manner to the MCI taxpayers' property in 2004, principally because Sansoucy had not yet been retained to assist the commissioner in changing the appraisal system prior to the 2004 version of Form 5941 being issued. As issued, that version of the form did not require companies to list their § 39 property according to the twenty-three FCC categories later adopted at Sansoucy's recommendation for 2005 and 2006. Therefore, Sansoucy's preferred economic obsolescence valuation methodology (using weighted calculations according to the property types reported by each taxpayer) could not be employed on the 2004 data. Instead, Sansoucy recommended aggregating all of the taxpayers' FY 2004 property categories and applying averaged cost trends and averaged depreciation percentages. This, Sansoucy testified, resulted in a conservative (low-end) estimate of the property's fair cash value, because the aggregation of property categories and averaging of depreciation percentages resulted in shorter average lives for most of the property and thus greater depreciation. The net effect of the greater deprecia-

---

[12]Sansoucy testified that the list of property used in the spreadsheet came from "a test of an actual [wireless] company" that had previously filed a list of its property with the Department of Revenue.

[13]At the hearing, Sansoucy noted that his report recommended a "functional/economic depreciation of 25 per cent." He testified that some taxpayers used the terms "functional" and "economic" obsolescence interchangeably, and so he employed a term that all taxpayers could use. For the sake of clarity, and in accord with the briefs in this case, we will refer to the twenty-five per cent deduction as an economic obsolescence deduction.

454 Mass. 635 (2009)                                    643

In the Matter of the Valuation of MCI WorldCom Network Services, Inc.

tion, Sansoucy opined, approximated the twenty-five per cent of additional economic obsolescence taken in FY 2005 and FY 2006.

The MCI taxpayers' expert, Weinert, testified that the commissioner should have applied an obsolescence deduction of about sixty-five per cent for all three years. Unlike Sansoucy, he relied on data showing the returns on capital in ninety-eight different industries. He then compared the returns in seventy-two of those industries[14] with the returns in the communications and interexchange-broadband carrier industries, which Weinert claimed was representative of the taxpayers.[15] He calculated that in the seventy-two industries, the weighted average of returns on capital for 2001 through 2006 was twelve per cent. The interexchange-broadband segments, on the other hand, returned only 4.5 per cent on capital. He compared these two returns and concluded that the interexchange-broadband segment was underperforming the rest of United States industry by sixty-three per cent.[16] He then conducted a second calculation. Based on a paper he had written, Weinert determined that all United States industries returned 13.5 per cent on capital for the period in question.[17] Comparing the 4.5 per cent return to the 13.5 per cent return (which he apparently rounded down to thirteen per cent), he determined that the interexchange-broadband sector was underperforming by sixty-five per cent. He therefore opined that sixty-five per cent was the proper economic obsolescence deduction.

Pomykacz, the obsolescence expert for the Boston assessors and Newton assessors, testified that the obsolescence deduction should have been twenty per cent. He arrived at that number by using a "complex analysis" of over-all land-line obsolescence, a

[14]Jerome Weinert testified that he excluded twenty-six industries "because the . . . data contained within [the survey] did not allow the calculations of returns on capital or equity."

[15]Although Weinart claimed that the interexchange-broadband subset of the telecommunications industry "was representative of MCI," the board never credited that statement.

[16]Weinert arrived at this calculation by dividing the 4.5 per cent telecommunications return by the twelve per cent broader industry return, which equals 37.5 per cent. Weinert thus concluded that the interexchange broadband sector returns only thirty-seven per cent of the profits that other industries were returning, rendering that sector sixty-three per cent less valuable.

[17]Weinert later admitted that this number represented only the telecommunications industry, not all United States industries.

"fiber optic utilization analysis," and a "simple analysis" based on equipment production capacity. In the first analysis, he noted that land-line telephone companies had recently seen profit declines of thirty-five per cent (2003), forty-seven per cent (2004), and fifty-three per cent (2005); however, he considered only one-half of those amounts (eighteen per cent, twenty-four per cent, and twenty-six per cent) in potential obsolescence deductions because he predicted that the industry would soon stabilize. In the "utilization" analysis, he forecast a short-term stabilized fiber optic utilization rate (fifteen per cent) and a long-term stabilized rate (thirty-five per cent); by subtracting the former forecast from the latter, he determined that fiber optic cable is currently being underutilized by twenty per cent.[18] Finally, in the "simple" analysis, he considered communications equipment production capacity. He testified that production should run at eighty per cent capacity; although it was currently running at only forty-five per cent to fifty-five per cent of capacity, he predicted that it should stabilize at sixty per cent of capacity. Subtracting his sixty per cent forecast from eighty per cent, he again arrived at twenty per cent as the proper economic obsolescence deduction.

The board first concluded that the commissioner's "trended reproduction cost new less depreciation methodology" was a valid approach to valuing telephone company § 39 property. The board reasoned that the commissioner's methodology was objective, transparent, and consistent. These conclusions are not challenged here.

The board then addressed the economic obsolescence deduction. "Recognizing the inherent difficulty in quantifying economic obsolescence" (see note 7, *supra*), it concluded that the "percentages offered by [the MCI taxpayers'] and the [Boston and Newton assessors'] valuation experts were lacking." Weinert's methodology, for example, "double counted" several factors, at one point citing economic weakness in both the "replacement cost" and "economic obsolescence" calculations. He also relied heavily on evidence that the national telecommunications industry had

---

[18]If accurate, these forecasts would show that the fiber optic cable was being underutilized by twenty percentage *points*, not twenty per cent: [fifteen per cent utilized] / [thirty-five per cent predicted future utilization] = [forty-three per cent utilization rate]. The underutilization rate, then, would be fifty-seven per cent.

suffered a downturn; however, he failed to demonstrate that a similar downturn had affected this particular § 39 property, or even Massachusetts as a whole. Nor did he prove, the board found, that the interexchange-broadband sector was representative of the MCI taxpayers. Finally, the board noted that Weinert's methodology would imply that fiber optic cable had an effective economic life of only 2.1 to 3.3 years, reflecting a plainly "excessive" deduction for depreciation and obsolescence. For those reasons, the board found that Weinert's sixty-five per cent economic obsolescence suggestion was "not credible."

The board also rejected the valuations of Pomykacz and Rodriguez, noting that their starting point for the property to be valued was not the property identified in the Forms 5941, resulting in both double counting and the failure to count properties located in the relevant municipalities. The board deemed Pomykacz's methodology "highly subjective," pointing out his fifty per cent reduction in recent lost profits and his "assumed, but essentially unsupported, future rate of 35%" fiber utilization rate. It also found that Pomykacz's "simple" analysis understated the economic obsolescence of land-line companies by including the manufacturers of wireless telecommunications property.

Finally, the board properly rejected suggestions by the MCI taxpayers' witnesses that any valuation should begin with a lower, bankruptcy-mandated cost restatement known as "fresh start accounting." Specifically, the MCI taxpayers proposed valuing certain property assets at about $5 million, while the original cost for the property was more than $42 million. "Fresh start accounting" is necessary for bankruptcy purposes, because "the overriding goal of the Bankruptcy Code [is] to provide a 'fresh start' for the debtor." *Reynolds Bros.* v. *Texaco, Inc.*, 420 Mass. 115, 123 (1995). Ad valorem DRC valuations, on the other hand, attempt accurately to predict the cost of reproducing unique property today, *Correia, supra* at 362, which is the relevant consideration for § 39 valuation purposes.

Based on the evidence, including its findings that the experts for the MCI taxpayers, Boston assessors, and Newton assessors were not credible, the board concluded that the commissioner's valuation was not substantially higher or substantially lower than the property's actual value. G. L. c. 59, § 39. As a result,

it allowed the commissioner's valuations for FY 2005 and FY 2006 to stand. These conclusions are supported by substantial evidence, and the board correctly applied the relevant law to its factual findings.

With respect to the commissioner's 2004 valuations, the board "observe[d]" (without citing evidence offered by appellants) that they "are not consistent with those for [FY] 2005 and [FY] 2006, unless an additional deduction of 25% for economic obsolescence is applied." The board then asserted that "[i]t also appears to the Board that the telecommunications market was afflicted by similar economic and other external factors in all of the fiscal years at issue." Therefore, the board concluded that the commissioner's certified valuation was "substantially higher than its fair cash value," and substituted its own valuations for that year, including the additional twenty-five per cent reduction. This was error.

The appellant has the burden of proving that the value of the property is substantially higher or substantially lower than the valuation certified by the commissioner. G. L. c. 59, § 39. If the appellant fails to meet that burden, the board is not empowered to substitute its own valuation of the § 39 property. Cf. *Assessors of Sandwich* v. *Commissioner of Revenue*, 393 Mass. 580, 586 (1984) ("Only if the taxpayer has met that burden does the board undertake an independent valuation of the property"). Here, the board did not credit any testimony or evidence introduced by the MCI taxpayers showing that the FY 2004 valuation was "substantially higher or substantially lower" than the property's actual value; to the contrary, the board specifically discredited the MCI taxpayers' expert witnesses on the issue of economic obsolescence. Nor did the board accept any of the appellants' arguments that the obsolescence deduction should apply to FY 2004, or find that they had met their burden on that point. In the absence of such a finding, the board erred in proceeding to revise the 2004 valuation unilaterally by substituting its own judgment for that of the commissioner.

b. *Municipal appeals.* The Boston assessors did not file a petition appealing from the § 39 valuations for FY 2004 and FY 2006. They argue, however, that the board can increase valuations of § 39 property even though they have not appealed, as

454 Mass. 635 (2009)                                    647

In the Matter of the Valuation of MCI WorldCom Network Services, Inc.

long as the taxpayer has filed a petition of appeal (seeking a lower valuation).

The argument is meritless under the plain meaning of the language of § 39:

> "*Every owner and board of assessors* to whom any such valuation shall have been so certified *may . . . appeal* to the appellate tax board from such valuation. . . . *In every such appeal, the appellant shall have the burden* of proving that the value of the [property] is substantially higher or substantially lower, as the case may be, than the valuation certified by the commissioner of revenue." (Emphases added.)

G. L. c. 59, § 39. The board correctly held that for the years 2004 and 2006, the Boston assessors were not "appellants"; therefore, "§ 39 provides no mechanism for the [b]oard to find a value substantially higher than that certified by the [c]ommissioner."

In support of their position, the Boston assessors rest their argument on one sentence in a 1933 act: "Notwithstanding anything contained in this act, the board in considering any appeal brought before it may make such decision as equity may require and may reduce or increase the amount of the assessment appealed from." St. 1933, c. 321, § 9. That sentence has never been cited by a Massachusetts appellate case, nor has it been codified in the General Laws, G. L. c. 58A (board's enabling act). Indeed, the "act" to which the language refers makes no reference to the commissioner's valuation of telephone company property, or § 39 appeals from those valuations. St. 1933, c. 321 ("An Act temporarily increasing the membership of the board of tax appeals and relative to the procedure before said board"). Even if that sentence retains any force, it is subordinated to the contrary, plain language of § 39, which was rewritten in 1955 to require that the "appellant" bear the burden of proving the commissioner's valuation to be too high or too low. See St. 1955, c. 344, § 31. "[W]hen the provisions of two statutes are in conflict, 'the more specific provision, particularly where it has been enacted subsequent to a more general rule, applies over the general rule.' " *Commonwealth* v. *Harris*, 443 Mass. 714, 739

(2005) (Marshall, C.J., concurring in part and dissenting in part), quoting *Doe* v. *Attorney Gen. (No. 1)*, 425 Mass. 210, 215 (1997).

c. *Corporate utility exemption.* The MCI taxpayers argue that MCImetro should have been granted the corporate utility exemption under G. L. c. 59, § 5, Sixteenth (1) (*d*). That clause "provides that a company classified as a corporate telephone utility is exempt from tax on all property other than real estate, poles, underground conduits, wires and pipes, and machinery used in manufacturing," *RCN-BecoCom, LLC* v. *Commissioner of Revenue*, 443 Mass. 198, 200 (2005); it is settled law that limited liability companies are not eligible for the corporate utility exemption. *Id.* at 207 ("By [clause Sixteenth's] plain language, it applies to corporations, not limited liability companies").

The exemption applies to telephone utility corporations only if they are subject to taxation under G. L. c. 63, § 52A. Section 52A applies to all "utility corporation[s] doing business within the commonwealth." G. L. c. 63, § 52A.[19] For the years in question, "utility corporation" was defined to include, inter alia, "every *incorporated* telephone and telegraph company subject to chapter one hundred sixty-six" (emphasis added). G. L. c. 63, § 52A (1) (*a*) (iii), as amended through St. 2004, c. 466, § 4.[20] Because MCImetro was not incorporated, it was not subject to taxation under § 52A; therefore, it was not eligible for the corporate utility exemption under G. L. c. 59, § 5, Sixteenth (1) (*d*). See *RCN-BecoCom, LLC* v. *Commissioner of Revenue, supra.* Nonetheless, for FY 2004 and FY 2005, MCImetro argues that it should be exempt under any of several theories: (1) it should benefit from the incorporation status of its parent, MWNS; (2) it filed or was included in Forms P.S.1 filed by MWNS so that it was treated like a corporation for Massachusetts tax purposes; and (3) for the period after MCImetro made an election to be taxed as a separate corporation for Federal tax purposes, it became a "foreign corporation" under G. L. c. 63, § 30 (2), as amended through St. 2003, c. 4, § 13. It also contends that with respect to

[19]"Every utility corporation doing business within the commonwealth shall pay annually a tax upon its corporate franchise in accordance with the provisions of this section." G. L. c. 63, § 52A.

[20]That section has been amended; effective for tax years beginning January 1, 2009, the word "incorporated" has been deleted. St. 2008, c. 173, §. 101.

FY 2005, it transferred the subject property to Brooks (a utility corporation) prior to July 1, 2004, and that July 1 should be the relevant date for G. L. c. 59, § 5, corporate utilities exemption purposes. We reject each of these arguments.

"The burden is on the taxpayer to demonstrate entitlement to an exemption claimed." *Macy's East, Inc.* v. *Commissioner of Revenue*, 441 Mass. 797, 804 (2004), quoting *South Boston Sav. Bank* v. *Commissioner of Revenue*, 418 Mass. 695, 698 (1994). "Exemption from taxation is to be strictly construed and must be made to appear clearly before it can be allowed." *New Habitat, Inc.* v. *Tax Collector of Cambridge*, 451 Mass. 729, 731 (2008), quoting *Springfield Young Men's Christian Ass'n* v. *Assessors of Springfield*, 284 Mass. 1, 5 (1933).

During the period when MCImetro was treated as a division of MWNS, it could not benefit from the incorporated status of its parent. Even though MCImetro was disregarded for corporate *income* tax purposes, it was always treated separately for personal property ad valorem taxation. For personal property taxation, exemption status turns on ownership. See G. L. c. 59, § 5, Sixteenth (property exempt from taxation only if "owned by [qualifying] bank or corporation"); *Born* v. *Assessors of Cambridge*, 427 Mass. 790, 795 (1998) (for property tax exemptions, "the form of legal ownership is related to whether one qualifies for the exemption"); *Minkin* v. *Commissioner of Revenue*, 425 Mass. 174, 181 (1997) (property owner's chosen form of organization creates tax consequences that must be accepted). MCImetro does not dispute that it is seeking an exemption for property that it, and not MWNS, owned. The same conclusion results from the filing of Forms P.S.1; even if MCImetro was included on those forms for Massachusetts income taxation purposes, it does not alter the fact that it was a limited liability company, not an incorporated utility, for the purposes of clause Sixteenth.

Even when MCImetro elected to be taxed as a separate corporation for Federal tax purposes, its status for the purposes of the corporate utility exemption did not change. MCImetro argues that at this point it became a foreign corporation under G. L. c. 63, § 30 (2), as then amended, which, unlike clause Sixteenth, includes limited liability companies. That section, however,

specifically does not apply to § 52A. G. L. c. 63, § 30 ("When used in [§ 30 (2)] and in sections 31 to 52, inclusive, the following terms shall have the following meanings").

Finally, MCImetro argues that it transferred its § 39 property to Brooks prior to July 1, 2004, and that the commissioner should use that date for evaluating the property's ownership status for the purposes of the corporate utility exemption for FY 2005. We disagree. The language of the statute provides that "the date of determination as to age, ownership or other qualifying factors required by any clause shall be July first of each year *unless another meaning is clearly apparent from the context*" (emphasis added). G. L. c. 59, § 5, Sixteenth (1) (*d*). For telephone utility corporations, another meaning is "clearly apparent": the relevant statute requires the commissioner to calculate "the valuation [of § 39 property] as of January first," and to complete and certify those values "[o]n or before May fifteenth in each year . . . ." G. L. c. 59, § 39. "Where the language of a statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words." *Household Retail Servs., Inc.* v. *Commissioner of Revenue*, 448 Mass. 226, 229 (2007), quoting *Gurley* v. *Commonwealth*, 363 Mass. 595, 598 (1973). The board reached the same conclusion, and its interpretation of tax statutes "may be given weight by this court." *Bell Atl. Mobile of Mass. Corp., Ltd.* v. *Commissioner of Revenue*, 451 Mass. 280, 283 (2008).

Additionally, "[c]ourts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." *Seideman* v. *Newton*, 452 Mass. 472, 477 (2008), citing *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996). Those considerations support the use of January 1 for § 39 valuation purposes. Section 39 requires the commissioner to certify valuations by May 15; it would make little sense to require this complex valuation and certification process to end on that date, only to have that work undone (and redone) if the § 39 property were transferred to an entity that qualified for the corporate utility exemption before July 1. MCI argues that the board (not the commissioner) could "order revised values via the Section 39 process" if

necessary. In essence, MCI would have each taxpayer file an appeal every time the property's ownership status changed hands between January 1 and July 1 of each year. This would create an entirely inefficient process, and would place an unnecessary burden on the board.[21]

4. *Conclusion.* For these reasons, we affirm the commissioner's valuations for FY 2005 and FY 2006. However, because the MCI taxpayers did not meet their statutory burden of proof, the board erred in requiring the commissioner to apply the twenty-five per cent economic obsolescence deduction to FY 2004. We reverse that order and remand that matter for the commissioner's valuation for that year to be reinstated. We also affirm the board's conclusion that municipalities must file a petition appealing the commissioner's § 39 valuation before the board may consider raising that valuation, and its conclusion that MCImetro was not entitled to the corporate utility exemption.

*So ordered.*

---

[21]It is unclear from the record, and the board did not find, whether any of the property transferred by MCImetro is even the type that might qualify for the exemption. See *RCN-BecoCom, LLC* v. *Commissioner of Revenue*, 443 Mass. 198, 200 (2005) (exemption does not apply to "real estate, poles, underground conduits, wires and pipes, and machinery used in manufacturing").