NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-222                                         Appeals Court

NANTASKET BEACHFRONT CONDOMINIUMS, LLC  vs.  HULL REDEVELOPMENT
AUTHORITY.

No. 14-P-222.

Plymouth.     November 7, 2014. – June 5, 2015.

Present:  Rapoza, C.J., Milkey, & Hanlon, JJ.

Contract, Performance and breach, Implied covenant of good faith
     and fair dealing, Damages, Provision for liquidated
     damages, Termination.  Practice, Civil, Summary judgment,
     Damages, Waiver.  Redevelopment Authority.  Administrative
     Law, Conflict of interest.  Conflict of Interest.  Public
     Employment, Unethical conduct.  State Ethics Commission.
     Waiver.  Damages, Breach of contract, Liquidated damages.

Civil action commenced in the Superior Court Department on
February 8, 2012.

The case was heard by Robert C. Cosgrove, J., on motions
for summary judgment.

Brian K. Bowen for the plaintiff.
Denise A. Chicoine (Edward S. Englander with her) for the
defendant.

MILKEY, J.  In 2004, plaintiff Nantasket Beachfront

Condominiums, LLC (Nantasket) and defendant Hull Redevelopment

Authority (authority) entered into a contract for the purchase and development of certain land in Hull. Under that "LAND DISPOSITION AGREEMENT" (LDA), Nantasket was to purchase the land, construct seventy-two units of housing, and develop a new public park. Subsequently, the proposed project encountered robust neighborhood opposition, and this in turn led to significant delays in the anticipated closing. Eventually, the authority terminated the LDA and notified Nantasket that it was retaining as liquidated damages $857,500 in deposits that Nantasket had made. This action ensued.

In a comprehensive and thoughtful decision, a Superior Court judge ruled in the authority's favor on summary judgment. He concluded that Nantasket indisputably stood in breach of the LDA, and that the authority was within its rights to terminate the agreement and to retain the deposits. On Nantasket's appeal, we affirm, albeit on somewhat different grounds.

Background.[1]  The parties execute the LDA. In order to spur the development of twelve acres of land that it owned, the authority in October of 2003 issued a detailed "Request for Proposals" (RFP). According to the RFP, the property "provides the transition between the [State-owned] . . . Nantasket Beach

---

[1] The facts, which are largely uncontested, are drawn from the summary judgment record. We view the facts in a light most favorable to Nantasket, the nonmoving party. See Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 118-119 (2010).

Reservation and a major residential area of the Town of Hull along Nantasket Avenue."  The RFP set forth a preferred development scenario in which approximately three-quarters of the land would be developed into "primarily passive public open space," with the rest (approximately three acres) developed as "residential dwelling units, or other uses, as may be acceptable to the [authority]."  In a section entitled "Site Constraints and Issues," the RFP discussed the applicability of various environmental and land use requirements.

Only two developers submitted proposals.  One was from Nantasket's parent company, which emphasized that, based on its thirty years of experience in developing residential and commercial projects, it was "well versed in overcoming a multitude of tough regulatory issues and environmental concerns."  On July 9, 2004, Nantasket and the authority executed the LDA, which spelled out their respective rights and obligations in thirty-three single-spaced pages (not including voluminous attachments).

Under the LDA, Nantasket would purchase the land for three and one-half million dollars (subject to various potential adjustments).  Nantasket would then build seventy-two units of housing, develop the open space, and eventually return the park land to public ownership and control.  Nantasket's specific development plans were subject to its completing the authority's

design review process and obtaining -- at its expense -- all necessary permits and other approvals (collectively termed "Approvals") from other State and local agencies.  The closing date was set for thirty days after Nantasket obtained the Approvals, but not later than July 9, 2006 (termed the "Outside Closing Date").  Thus, as originally executed, the LDA contemplated that all necessary permitting and the closing would be completed within two years.

Deposits.  Nantasket paid a $97,000 deposit to the authority at the execution of the LDA, in addition to a $25,500 deposit it had previously paid.  An additional deposit of $122,500 was due on August 17, 2004, bringing the total deposit due by that point to $245,000.  Until the closing actually took place, additional deposit payments of $122,500 each would be due at the six month anniversary of the date of the LDA and the one year anniversary, and then "Extension Deposits" of $122,500 each would be due every three months after that.  The LDA stated that if Nantasket missed any deposit payment, this "shall constitute a default."

Termination rights.  The LDA gave each party the right to terminate the agreement in certain situations.  In the event that Nantasket defaulted on its obligations and did not achieve a cure of that default within thirty days of receiving written notice from the authority, the authority could terminate the LDA

and retain all deposits paid.[2]  For its part, Nantasket could terminate the LDA and secure a return of its deposits in three different types of scenarios.  First, Nantasket was given until August 4, 2004, to inspect the property, and until August 16, 2004, to inspect the title.  If such inspections revealed a defect in either, then it could terminate the LDA within those respective deadlines.  Second, Nantasket could terminate the LDA in the event that a local permitting agency prevented the project from going forward as planned and adjustments to the project or purchase price could not be agreed upon to accommodate the potential loss in value (this scenario was termed a "Local Permit Problem").  Third, if a third party challenged the issuance of one or more of the approvals that the project needed, Nantasket could terminate the LDA in lieu of defending the action.

Project delays.  Almost immediately, the project sparked significant opposition from local residents.  In 2004, Jacqueline Chase, a direct abutter, cofounded a group to try to stop it.  At Chase's suggestion, the group called itself "No Way HRA!"  The project opponents used every opportunity to attempt to derail the project.  Chase herself attended seventy local

---

[2] The thirty-day cure period could be extended if the default could not be cured within thirty days even with the exercise of due diligence.  Nantasket has never argued that this provision applies here.

board meetings on the topic.  After the Hull zoning board of appeal (ZBA) issued a special permit for the project on March 30, 2006, six project opponents filed an action in Superior Court appealing the special permit pursuant to G. L. c. 40A, § 17.  The lead plaintiffs in that action (zoning appeal) were Chase and Phyllis Aucoin, another leading member of No Way HRA!.

First amendment to the LDA.  Nantasket did not use the filing of the zoning appeal as an occasion to terminate the LDA, but instead elected to defend it.  However, with it becoming increasingly obvious that Nantasket could not obtain all approvals by July 9, 2006 (the original Outside Closing Date), Nantasket requested and secured an amendment to the LDA.  This amendment dated May 10, 2006, set a new closing date of forty days after Nantasket received all approvals, but in no event later than the earlier of:  (1) ninety days after the "Appeals Termination Date" (set as the date that the zoning appeal and any other appeals of project approvals eventually were resolved in Nantasket's favor),[3] or (2) July 9, 2012 (the amended Outside

---

[3] The "Appeals Termination Date" was defined in full as the date "of the final disposition, in favor of the validity of the Approvals, of all appeals challenging or appealing the issuance of any Approval, including without limitation the Zoning Appeal, including the exhausting of all further appeals or the expiration of the time for bringing any further appeal."

Closing Date).[4]  The parties also agreed that after Nantasket paid the additional Extension Deposits due on July 9, 2006, and October 9, 2006 (bringing the total deposits held by the authority to $857,500), further Extension Deposits would be waived until the Appeals Termination Date.[5]

Chase and Aucoin join the authority's board.  In 2007, Chase and Aucoin ran for, and were elected to, the authority's board.  Even after that, they continued their active opposition to the project in their personal capacity.  Thus, for example, after a Superior Court judge in 2008 ruled in Nantasket's favor on summary judgment in the zoning appeal, Chase and Aucoin joined in appealing that decision to this court.

Second amendment to the LDA.  With the continued delays, Nantasket requested a further extension of the Outside Closing Date, and also requested that Chase and Aucoin recuse themselves from participating in matters concerning the project.  On August 3, 2009, by a vote of three to one (with one abstention), the authority's board extended the Outside Closing Date to July 9, 2015.  Chase voted against the extension, while Aucoin abstained.

---

[4] As part of the first amendment, Nantasket expressly waived its right to terminate the LDA based on the filing of the zoning appeal.

[5] The parties also agreed to reduce the purchase price of the land by $125,000, because of a reduction in the scope of the project required by the special permit.

The end of the zoning appeal.  The zoning appeal was finally resolved on May 3, 2010, when a stipulation of dismissal was filed in this court.  This removed a significant obstacle to the project's moving forward, but others remained.  Indeed, changes to the project that resulted from review by the State Department of Environmental Protection pursuant to the Wetlands Protection Act, G. L. c. 131, § 40, meant that Nantasket would have to resubmit the project for various additional local approvals.  Meanwhile, changes to the real estate market in the interim called into question the financial viability of the project.  In fact, as Nantasket acknowledged in a letter to the authority dated September 10, 2010, "[t]here exists no bank financing available for this project, and there are no equity partners willing to invest in it."

Nantasket's efforts to renegotiate the deal.  Under the express terms of the LDA, Nantasket's inability to obtain financing did not constitute a force majeure event excusing its performance.  In light of the new circumstances it faced, Nantasket sought to renegotiate the terms of the original deal.  In its September 10, 2010, letter, Nantasket proposed to construct the park improvements immediately using a portion of the deposit funds, with the remainder of the funds to be returned to Nantasket.  Also, the housing would be developed in phases on a more long-term basis (with the hope that the housing

market would improve in the interim), with Nantasket to pay a pro rata share of the original purchase price for each phase. The authority flatly rejected this proposal, and stated its view that "[g]iven that there is no longer any appeal pending, the payment of the Extension Deposits must resume." At the same time, the authority indicated flexibility in three areas. First, instead of insisting that the closing take place within forty days of Nantasket's receiving the approvals,[6] the authority expressed a willingness to extend the closing until November 9, 2014. Second, the authority indicated it was open to allowing the postclosing construction to be completed in phases (so long as Nantasket purchased all of the property at the closing). Third, the authority indicated that if a new agreement were reached, it would agree to have new Extension Deposits due every six months rather than every three.

By letter dated November 1, 2010, Nantasket countered that it would not agree to pay any new Extension Deposits before the closing. As to the existing deposit monies, Nantasket stated that it needed the return of $250,000 "plus the cost of designing and permitting the park." Nantasket also indicated that it could only purchase all of the property at the closing if market rate financing was available.

---

[6] The second amendment had not modified this provision but instead had changed only the Outside Closing Date.

The authority demands payment. As a result of this back and forth, the parties remained far apart. The authority's further response on November 19, 2010, brought them no closer. That letter rejected Nantasket's last proposal, offered no new proposal, and instead merely sharpened the authority's position that Nantasket had to resume payment of the Extension Deposits. In fact, the letter declared that Nantasket was already in default for not making additional Extension Deposit payments of $122,500 each on August 3, 2010, and November 3, 2010, and for not actively pursuing the remaining approvals for the project. According to the authority, if these problems were not cured within thirty days, this "will leave the Authority no choice but to declare [Nantasket] to be in default of its obligations under the LDA [which] . . . would allow the Authority to exercise all of its rights and remedies under Section 10.2 of the LDA, including, without limitation, the termination of the LDA and the retention of the deposit as liquidated damages under the LDA."

In its response dated December 30, 2010, Nantasket underscored its continued unwillingness to resume payment of any additional Extension Deposits. Nantasket also stated its view that there were outstanding title problems that the authority had not cured and that this both excused Nantasket's failure to pay additional Extension Deposits and provided Nantasket its own

basis for terminating the LDA and demanding return of the deposits paid to date.[7]  The authority responded on January 11, 2011, by explaining its view that the title problems had been cured and that Nantasket had no grounds for refusing to resume making the Extension Deposits.  It also reiterated its demand that such sums be paid.  In a short and extremely pointed letter dated February 14, 2011, the authority once again demanded payment.

The termination of the LDA.  After the demanded additional Extension Deposit payments were not made, the authority's board on April 19, 2011, voted to send Nantasket a letter terminating the LDA.  Four of the five board members were present (including Chase and Aucoin), and the vote apparently was unanimous.  The record reflects that before the vote was taken, the board's chairman, Bartley Kelly, purported to invoke the "rule of necessity" and that Chase and Aucoin "follow[ed]."[8]  No further

---

[7] Nantasket had raised some of these title issues in a 2004 letter that was sent to the authority prior to the relevant deadline set forth in the LDA.  The letter stated a view that the problems could be resolved and requested "an extension of the 'Title Inspection Period' for the period of time necessary for the parties to address these issues."  It further stated that "[i]n the event that the Authority is unable or unwilling to address these issues then, most reluctantly, kindly consider this written notice of termination pursuant to [the relevant provision in the LDA]."  Other of the title issues arose only later.

[8] The "rule of necessity" is a doctrine that recognizes that in some circumstances, public officials who otherwise have an

explanation was given.  The authority sent Nantasket a letter formally terminating the LDA that same day.

Discussion.  Nantasket's five-count complaint relies on various overlapping contract-related theories.  However, permeating Nantasket's legal claims is its overarching contention that the authority's actions were tainted by serious conflicts of interests among two or three of its five board members.  In addition, Nantasket argues that the authority's proceeding to terminate the LDA in the face of those issues violated the covenant of good faith and fair dealing implied in every Massachusetts contract.  See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  We begin with addressing these ethical considerations.

1.  Ethical issues.  As noted, Chase and Aucoin led the opposition to the project, and they continued that opposition after they joined the authority's board.  Based on the allegations they raised in the zoning appeal and the deposition

_____

ethical duty to recuse themselves from participating in a particular matter nevertheless may do so if necessary for the public entity to act.  See Boston Retirement Bd. v. Contributory Retirement Appeal Bd., 441 Mass. 78, 85 (2004), citing Moran v. School Comm. of Littleton, 317 Mass. 591, 593 (1945), and cases cited.  By letter dated July 26, 2010, town counsel had sent a letter to the authority's board that generally explained how the rule of necessity worked, and that cautioned that the rule should be invoked only as a "last resort" (and then only in accordance with certain specified procedures).  The letter did not analyze whether any members of the authority's board in fact had a disqualifying conflict of interest.

of Chase taken in that case, Nantasket argues -- with significant force -- that Chase and Aucoin had a direct and substantial economic stake in whether this particular project succeeded or failed.  If so, then Chase and Aucoin had a "financial interest" in the authority's consideration of the project.[9]  This means that unless one of the recognized exceptions applied, they could not participate as board members in matters concerning the project.  See G. L. c. 268A, § 19.

The judge noted that Chase and Aucoin had an "undisputed conflict of interest."  Nevertheless, he seems to have concluded that they satisfied their ethical obligations and that they, in any event, did not act in bad faith.  With regard to their failure to follow the procedures for invoking the rule of necessity outlined in town counsel's letter (see note 8, supra), the judge concluded that this did "not evidence bad faith, where their participation in the abutter litigation and opposition to the Project was [already] well known."  Finally, he ruled that even if the vote to terminate was taken in bad faith, this was immaterial, because Nantasket itself was in breach of the contract before the vote was taken and the authority therefore had an express contractual right to terminate.

---

[9] Whether Kelly also had a disqualifying financial interest is less clear because the record reveals little about his situation.

Although we agree with the motion judge that the ethical issues Nantasket sought to raise ultimately do not aid its cause, we arrive at that conclusion by a somewhat different path. Without resolving whether his analysis of the rule of necessity was correct, we note that the issues do not appear to be as straightforward as he suggested. As the State Ethics Commission (commission) has emphasized, and the authority acknowledges, the rule of necessity is to be invoked only "as a last resort." State Ethics Commission Advisory 05-05, at 841 (2005). Under the commission's interpretation of that rule, if in fact there was no need for Kelly to recuse himself, then Chase and Aucoin could not have invoked the rule because their participation would not have been necessary to achieve a quorum (assuming the absent member could have attended a subsequent meeting). See Ibid.[10] Thus, any premise that Chase and Aucoin satisfied their G. L. c. 268A, obligations lies in at least some doubt.

We also question the judge's conclusion that Nantasket's being in default necessarily rendered any bad faith by authority officials beside the point. To be sure, we agree that the

---

[10] Compare Attorney Gen. v. Department of Pub. Util., 390 Mass. 208, 215-216 (1983) (approving use of rule to avoid deadlock even where presence of a quorum was not an issue); Boston Retirement Bd., 441 Mass. at 85 (approving use of rule even though filling vacant board seat by the governor could have provided a quorum).

authority had no obligation to renegotiate the terms of the contract or to sit idly by once Nantasket defaulted (especially where Nantasket conceded that it could not bring itself in compliance due to the collapse of the housing market).  At the same time, the authority's decision to terminate the LDA was a discretionary one, and parties to a contract cannot exercise such discretion based on improper motives.[11]  See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991).  It is of course axiomatic that public officials should not be exercising their authority to promote their own financial interests.

Our recognition of these principles creates a potential conundrum about how to proceed.  On one hand, the case law teaches that courts are to apply a markedly strong presumption that public officials act in good faith, and it casts a jaundiced eye toward judicial inquiries into what really motivated the official action.[12]  See, e.g., LaPointe v. License

---

[11] Put differently, the authority's right to terminate the LDA (based on Nantasket's breach) does not necessarily immunize its exercise of that right from any scrutiny.

[12] This is a case where the plaintiff is challenging the motives behind otherwise valid government action; it is not one where the government actions themselves were improper.  Compare Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. 430, 451-459 (1997). In that vein, it cannot be said that the authority unfairly terminated the LDA in order to put itself in a better position than had both parties performed.  Instead of receiving a total purchase price of $3,375,000 and the housing and park development that it desired, the authority was left with only

Bd. of Worcester, 389 Mass. 454, 459 (1983); Brennan v. The

Governor, 405 Mass. 390, 397-398 (1989).  Such presumptions

serve to avoid interference with the democratic process.[13]  In

this regard, we note that the voters of Hull may have elected

Chase and Aucoin to the authority's board precisely because of

their opposition to the project.  On the other hand, the

presumption that public officials act in good faith is not

irrebuttable, and there are exceptional cases where courts have

invalidated an otherwise valid public action based on proof that

the "dominant reason" the action was undertaken was an improper

one.  See, e.g., Pheasant Ridge Assocs. Ltd. Partnership v.

Burlington, 399 Mass. 771, 777-780 (1987) (invalidating the

taking of land for a public park, done pursuant to a town

meeting vote, where the manifest purpose behind this was to

block low or moderate housing at the site).  Nantasket argues

that because the summary judgment record allows the inference

that the board members made their decision to terminate the LDA

_____

$857,000 as liquidated damages while having to restart the
development process from scratch in the midst of an anemic
housing market.

   [13] In one case, we commented that a court would not set
aside a legislative act even upon proof that all of the
affirmative votes were induced by bribery.  See Knowles v. Codex
Corp., 12 Mass. App. Ct. 493, 498 (1981).  The Supreme Judicial
Court has cited this dicta, although in a manner that leaves in
some doubt its own views of the principle.  See Pheasant Ridge
Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 776-778
(1987).

for an improper reason, the ethical issues could not be resolved as a matter of law.

For purposes of resolving Nantasket's contract-based claims, it is important to keep in mind that it is the authority that was the party to the LDA, not individual board members. Municipal redevelopment authorities are liable in contract and tort "in the same manner as . . . private corporation[s]," and their officers and agents are, in the same fashion as those of private corporations, generally not personally liable in tort or contract. G. L. c. 121B, § 13, inserted by St. 1969, c. 751, § 1. As the Supreme Judicial Court has held in the context of a private corporation, individual board members' conflicts of interest are not imputed to actions taken pursuant to a valid vote of the board. See Estate of Moulton v. Puopolo, 467 Mass. 478, 482, 488-489 (2014) (noting that the acts of the corporation's board by valid vote and those of the corporation are "one and the same" even where individual board members face conflicts of interest). Absent evidence of bad faith on the part of the authority as a contracting entity, Nantasket cannot be heard to claim that the termination amounted to a bad faith breach warranting damages.

This did not leave Nantasket without a potential remedy for any ethical breaches by individual board members. However, to follow such remedies, Nantasket would have had to file a

complaint with the commission alleging violations of G. L.
c. 268A. See G. L. c. 268B, § 4(a) (governing the filing of
verified administrative complaints with the commission).
Compliance with State ethical rules is now overseen by the
commission. See Doe v. State Ethics Commn., 444 Mass. 269, 271
(2005) (referring to the commission as "the primary civil
enforcement agency for violations of the conflict of interest
law, G. L. c. 268A," and noting that the commission is
authorized "to identify and seek redress for ethics violations
by public officials in the Commonwealth"). Thus, the commission
regulates the conduct of municipal officials, provides guidance
to them, and investigates whether they have violated their
obligations under G. L. c. 268A. Doe, supra. If the commission
determines that ethical breaches "substantially influenced the
action taken by any municipality in any particular matter," the
commission may order that the municipal action be "avoid[ed],
rescind[ed] or cancel[ed]. . . upon request by said municipal
agency." Leder v. Superintendent of Schs. of Concord & Concord-
Carlisle Regional Sch. Dist., 465 Mass. 305, 311 (2013), quoting
from G. L. c. 268A, § 21(a).[14] Nantasket could have raised its

---

[14] Granted, invalidation of the municipal action is
available only when the municipal entity requests such relief.
However, the statute also authorizes alternative relief for a
party who has suffered damages from an ethical breach. If the
commission determines that a municipal official has "acted to
his economic advantage in violation of" certain sections under

ethical concerns with the commission,[15] but did not do so.[16]  In the circumstances of this case, Nantasket's failure to follow the statutorily prescribed procedures prevents it from now asking a court to invalidate the LDA termination vote (or to seek damages from individual board members).  See Leder, supra at 313.  Although the remedies provided for in G. L. c. 268A, are not exclusive, the statute "contemplates a primary role for

---

G. L. c. 268A, it may award damages to the municipality and restitution to injured third parties (subject to various conditions and limitations).  Leder, supra at 311 & n.10.  In the event that the commission determines that damages exceed the amount it is authorized to order through administrative action ($25,000), the commission "may bring a civil action against the violator to recover such damages."  G. L. c. 268A, § 21(b), inserted by St. 2009, c. 28, § 80.  Municipal officials are protected from enforcement by the commission if they rely upon a formal opinion from municipal counsel issued pursuant to G. L. c. 268A, § 22, so long as certain procedures are followed.  See 930 Code Mass. Regs. 1.03(3) (2012).

[15] The filing of a verified complaint triggers a "preliminary inquiry" into any alleged violations.  G. L. c. 268B, § 4(a), inserted by St. 1978, c. 210, § 20.  If there is "reasonable cause for belief" that a violation has occurred, the commission may, upon a majority vote, initiate an adjudicatory proceeding.  G. L. c. 268B, § 4(c), inserted by St. 1978, c. 210, § 20.

[16] Nantasket did not raise its ethical concerns with the commission after the 2011 termination vote.  Nor did Nantasket prior to that vote ever seek any judicial or administrative adjudication whether the potentially conflicted board members could participate in matters related to the project.  Compare Graham v. McGrail, 370 Mass. 133, 136-137 (1976) (concluding -- in a case that arose before the commission was created -- that a declaratory judgment action was available for one member of a school committee to address the application of G. L. c. 268A, § 19).  The extent to which Nantasket could have obtained such relief here is not before us.

the commission."  Leahy v. Local 1526, Am. Fedn. of State, County, & Mun. Employees, 399 Mass. 341, 378 (1987).  In the case before us, there are numerous unresolved issues surrounding whether, and to what extent, individual board members violated the governing statute by participating in the board's vote. Resolution of those issues "requires the application of the [commission's] expertise."  Id. at 350.  To the extent Nantasket wanted to rely on the alleged ethical breaches to make out its contract claim, it should have brought the issues to the commission in the first instance.

2.  Merits of Nantasket's other contract-related claims. Stripped of this ethical overlay, resolution of Nantasket's underlying contract claims is relatively straightforward, at least based on the arguments that Nantasket raised.

a.  Nantasket's obligation to renew the Extension Deposit payments.[17]  Once the zoning appeal was dismissed, the authority took the position that the Appeals Termination Date had been reached (there being at that moment no pending appeals) and that Nantasket's duty to pay additional Extension Deposits resumed

_____

[17] As noted, the authority also terminated the LDA on the grounds that Nantasket was not diligently pursuing remaining permit approvals.  The motion judge correctly concluded that there was a dispute of material fact regarding that issue. Therefore, like the motion judge, we will focus on Nantasket's compliance with the obligation to resume paying the Extension Deposits.

ninety days later (August 3, 2010).[18] Nantasket never argued in the trial court, nor does it argue on appeal, that this interpretation was incorrect.[19] To the contrary, Nantasket itself stated in its appellate brief that "[u]nder the LDA, as then amended, additional $122,500 deposits were due every three months beginning on August 3, 2010." Therefore, any argument that the Appeals Termination Date did not run when the zoning appeal was dismissed has been waived.

b. Whether Nantasket's failure to pay the Extension Deposits was excused. It is undisputed that Nantasket did not make the Extension Deposit payments due on August 3, 2010, November 3, 2010, and February 3, 2011. Nantasket nevertheless maintains that it was not in breach, because its conduct was excused by the authority's own material breach of the contract. See Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 610 (2003). Specifically, Nantasket points to the fact that although the authority's board approved a second

---

[18] Strictly speaking, ninety days after the dismissal of the zoning appeal on May 3, 2010, would have been August 1, 2010, but the record reflects that both parties consistently treated "ninety days" as meaning three months.

[19] As noted, the term Appeals Termination Date was defined by reference to "the final disposition . . . of all appeals challenging or appealing the issuance of any Approval." See note 3, supra, for full text. Even after the zoning appeal was dismissed, various approvals remained outstanding, thus allowing opportunities for additional appeals to be filed.

amendment to the LDA on August 3, 2009, it subsequently failed to execute a formal amendment to the LDA memorializing that vote.[20] To be sure, the authority's actions in this regard lie unexplained in the summary judgment record.[21] However, also missing is any proof that the authority's failure to execute the second amendment played any material role in Nantasket's unwillingness or inability to resume making the required Extension Deposits. In fact, nowhere in the pointed exchanges between the parties leading up to the termination of the LDA is there any reference whatsoever to the authority's refusal to execute a formal second amendment; the parties' discussion instead had turned to a potential third amendment to overhaul the original agreement. Under these circumstances, Nantasket

---

[20] Nantasket also argues that that the authority directly repudiated the second amendment to the LDA. Its evidence of this is that in its letter of October 4, 2010, the authority offered to extend the closing until November 9, 2014 (which fell eight months before the July 9, 2015, Outside Closing Date already approved by the board in its vote on the second amendment). However, there is no direct conflict between the authority's offer and the second amendment, which modified only the Outside Closing Date, not the actual date that the closing was supposed to take place.

[21] Because Nantasket did not conduct any discovery before the discovery deadline lapsed, it largely has itself to blame for the relatively thin state of the summary judgment record. The judge did not abuse his discretion in declining Nantasket's request to extend the discovery deadline.

has failed to offer sufficient proof -- even for purposes of summary judgment -- that its nonperformance was excused.[22]

c.  Whether the parties suspended their termination rights. Nantasket also argues that even if its own breach allowed the authority to terminate the LDA and retain the deposit, the authority implicitly suspended its right to do so while it was negotiating a third amendment to the LDA.  Once the authority engaged in such negotiations, Nantasket maintains, it owed unequivocal notice that negotiations had ended and a reasonable time to cure any deficiencies before terminating the LDA.  See, e.g., Church of God in Christ, Inc. v. Congregation Kehillath Jacob, 370 Mass. 828, 833-834 (1976).  According to Nantasket, such notice was critical because at the time, it had its own right to terminate the LDA and to have all its deposits returned.

Nantasket's arguments are not without some force.  Once the zoning appeal was dismissed, the parties did engage in some substantive negotiations about remaking their original

---

[22] Nantasket also argues that because Chase and Aucoin should have recused themselves from participation, the authority violated the contractual requirement that its execution of all documents related to the LDA be duly authorized, valid, and enforceable.  However, on their face, the relevant documents executed by the authority in relation to the termination of the LDA were authorized, valid, and enforceable, and, as noted, Nantasket has forsworn seeking to invalidate the authority's actions based on any alleged ethical breaches by its board members.

agreement, and in that context, the authority specifically showed some flexibility about the frequency with which further Extension Deposits would be due. In addition, Nantasket has some argument that -- at least at the beginning of the negotiations over a third amendment to the LDA -- it possessed its own right to terminate the LDA, even if that argument could not be characterized as strong.[23]

However, the authority's position on the resumption of the Extension Deposits hardened over time, with the authority making it increasingly clear that it would terminate the LDA if the Extension Deposits were not paid as previously agreed. At least by the authority's January 11, 2011, letter, it had taken that issue off the table. To the extent that the authority had an obligation to provide unequivocal notice that Nantasket was in default and faced forfeiture of its deposit, the authority satisfied that obligation. If Nantasket felt it still retained its own right to terminate the LDA, this was the time to

---

[23] In the relevant time period, no permit appeals were pending (Nantasket having elected to defend and having successfully defended the zoning appeal), and there does not appear to have been a pending "Local Permit Problem" (as that term was defined in the LDA) even though Nantasket still had to secure some additional local approvals. Nantasket's strongest argument appears to be that the title issues it identified had not fully been cured. Because Nantasket did not terminate the LDA within the relevant Title Inspection Period, its ability to make such an argument depends on its related contention that the authority, by its conduct, had implicitly agreed to extend that period. Compare McCarthy v. Tobin, 429 Mass. 84, 88-89 (1999).

exercise it.  Alternatively, Nantasket could have tried to negotiate a standstill agreement to let negotiations continue. It chose to pursue neither option, and cannot now be heard to claim that the authority's actions were procedurally unfair.

d.  Liquidated damages.  Finally, Nantasket argues that the authority's retaining the $857,500 as liquidated damages cannot stand because the sum is so disproportionate to the authority's actual damages that it amounts to an unenforceable penalty.  See NPS, LLC v. Minihane, 451 Mass. 417, 419-420 (2008).  A contractual liquidated damages provision is entitled to a presumption of validity, especially where, as here, it was negotiated between two sophisticated parties.  The party seeking to invalidate a liquidated damages provision bears the burden of proving that it is unenforceable, and "we resolve reasonable doubts in favor of the aggrieved party" (here, the authority). Ibid.  "A liquidated damages provision will usually be enforced, provided two criteria are satisfied:  first, that at the time of contracting the actual damages flowing from a breach were difficult to ascertain; and second, that the sum agreed on as liquidated damages represents a 'reasonable forecast of damages expected to occur in the event of a breach.'"  Ibid., quoting from Cummings Properties, LLC v. National Communications Corp., 449 Mass. 490, 494 (2007).

At the time the parties executed the LDA, trying to calculate the amount of damages that the authority would suffer from a breach by Nantasket was inherently difficult, as a matter of both theory and practice. Therefore, the first criterion of the two-part test is easily satisfied. The difficulty in predicting such damages makes the second prong challenging to apply. Without attempting to demarcate the boundaries of what forecast would be reasonable in these circumstances, we agree with the motion judge that Nantasket has not met its burden of showing that the liquidated damages due here (which in this case, amounted to some twenty-five percent of the purchase price of the land) were so disproportionate to predictable actual damages as to amount to an illegal penalty.

Nantasket emphasizes that under the LDA, additional Extension Deposits of $122,500 were to accrue every three months, which allowed rapid escalation of potential liquidated damages as any delays mounted. However, passing over the foreseeability of such delays (especially by a developer that sold itself as being experienced in overcoming regulatory hurdles), we note that the authority reasonably agreed to suspend the payment of additional Extension Deposits for over three-and-one-half years while the zoning appeal was pending. In fact, the last deposit payment that Nantasket ever made came on October 9, 2006 (just three months after the originally

contemplated closing date).  Moreover, the record makes plain that the dominant problem that caused Nantasket to default on its obligations was not the delay per se, but the intervening collapse of the real estate market.  In sum, Nantasket cannot claim any substantive unfairness in the enforcement of the liquidated damages provision to which it freely agreed.

Conclusion.  For the reasons set forth above, we affirm the judgment.

So ordered.