RCN BECOCOM LLC vs. COMMISSIONER OF REVENUE, 100 Mass. App. Ct. 802

 
 RCN BECOCOM LLC vs. COMMISSIONER OF REVENUE & others. [Note 1]

100 Mass. App. Ct. 802
 January 7, 2022 - April 1, 2022

Court Below: Appellate Tax Board
Present: Milkey, Massing, & Hershfang, JJ.

 

Telephone Company. Taxation, Personal property tax: value, Appellate Tax Board: jurisdiction, Commissioner of revenue, Assessors. Jurisdiction, Appellate Tax Board. Evidence, Value, Opinion. Commissioner of Revenue. Value. Witness, Expert.

The Appellate Tax Board properly exercised its jurisdiction to hear a telephone company's appeal challenging valuations made by the Commissioner of Revenue (commissioner), pursuant to G. L. c. 59, § 39, of certain personal property the company held in the Commonwealth, where the company cured any deficiencies in its initial submittals to the commissioner that provided information regarding such personal property, regardless of whether such deficiencies were viewed as material omissions or affirmative misstatements. [807-810]

The Appellate Tax Board (board) properly determined that a telephone company challenging valuations made by the Commissioner of Revenue (commissioner), pursuant to G. L. c. 59, § 39, of certain personal property the company held in the Commonwealth failed to carry its burden of proof that the commissioner substantially overvalued the property at issue by using the "depreciated reproduction cost" valuation method, which calculates the current cost of reproducing a property less depreciation from deterioration and functional and economic obsolescence [811-814]; further, the board did not abuse its discretion or commit an error of law in declining to credit opinion testimony introduced by the company as to the market value of its personal property [814-815] or in declining to disqualify the commissioner's expert witness based on an alleged conflict of interest [815-816].

APPEAL from a decision of the Appellate Tax Board.

 William Hazel for the taxpayer.

 Anthony M. Ambriano for board of assessors of Boston & others.

 Daniel J. Hammond, Assistant Attorney General, for Commissioner of Revenue.

 Page 803 

 MILKEY, J. Pursuant to G. L. c. 59, § 39, the Commissioner of Revenue (commissioner) is charged with establishing the fair cash value of certain personal property that "telephone companies" hold in the Commonwealth. Such property (generally known as § 39 property) includes "machinery, poles, wires and underground conduits, and wires and pipes." G. L. c. 59, § 39. Once the commissioner has determined the value of § 39 property located in a particular municipality, the municipality must use that value in assessing taxes against the property. See generally Matter of the Valuation of MCI WorldCom Network Servs., Inc., 454 Mass. 635, 637-638 (2009) (MCI). By providing for the centralized valuation of § 39 property, the statute protects telephone companies from having such property assessed differently in each of the municipalities in which they own such property. [Note 2] See Commissioner of Corps. & Taxation v. Assessors of Springfield, 330 Mass. 433, 436 (1953).

 Telephone companies may petition the Appellate Tax Board (board) to claim that the market value of the § 39 property is "substantially lower . . . than the valuation certified by the commissioner of revenue," and municipal assessors may petition the board that such values are "substantially higher." MCI, 454 Mass. at 640, quoting G. L. c. 59, § 39. If the party challenging the valuations set by the commissioner proves that the market value is "substantially lower" or "substantially higher," the board then makes its own determinations of value. Assessors of Sandwich v. Commissioner of Revenue, 393 Mass. 580, 586 (1984) ("Only if the taxpayer has met [its] burden does the board undertake an independent valuation of the property").

 In the matter before us, petitioner RCN BecoCom LLC (RCN) challenged the value that the commissioner set for its § 39 property located in eighteen municipalities for three tax years: 2012, 2013, and 2014. The commissioner requested that the board dismiss RCN's petitions for lack of jurisdiction on the ground that RCN had not completed the applicable tax form in the

 Page 804 

 manner required. The board rejected that jurisdictional argument, but after hearing twenty days of testimony, upheld the commissioner's valuation on the merits. RCN now appeals, and the commissioner has cross-appealed to contest the board's threshold ruling that it had jurisdiction. We affirm the board's decision in toto.

 Background. 1. The commissioner's methodology. We begin by providing a summary of the valuation system that the commissioner uses to determine the value of § 39 property, which the Supreme Judicial Court has specifically upheld. See MCI, 454 Mass. at 641-646. Because of the nature of § 39 property, the commissioner relies on a method known as "'depreciated reproduction cost' (DRC), defined as '[t]he current cost of reproducing a property less depreciation from deterioration and functional and economic obsolescence'" [Note 3] (citation omitted). Id. at 638-639. With the assistance of consultant George E. Sansoucy, the commissioner developed an elaborate DRC model that begins with the costs that actually were incurred at the time the property was installed (original installation costs). See id. at 639-640. The original installation costs are then adjusted to account for three different factors: how such costs have "trended" over time, depreciation, and various types of obsolescence. See id. 

 One attribute of the commissioner's DRC-based methodology bears highlighting. The process that the commissioner employs does not first determine the value of all of a company's § 39 property in the Commonwealth, and then seek to apportion that sum to each of the municipalities in which such property is located. Rather, the commissioner uses a standardized method to determine the value of the particular § 39 property that is actually located in each municipality. The commissioner thus uses what can be termed a "ground-up" approach. 

 Page 805 

 2. The applicable tax form. Each year, telephone companies are required to complete a tax form that the commissioner then uses to make the determinations of value for their § 39 property in the various municipalities in which such property lies. That form, known as State Tax Form 5941 (Form 5941), requires the taxpayer to provide information regarding its § 39 property, including original installation costs. Specifically, taxpayers must, for each municipality, set forth line items for the § 39 equipment they own, and must include -- for each item -- the date of installation and original installation cost. The treasurer of the taxpayer is required to sign the form, attesting that the information included in the form is "true, correct and complete to the best of [his or her] knowledge and belief." 

 3. The history of RCN. Prior to the tax years in question, the relevant § 39 property was held by RCN Corporation (RCN Corp.) through multiple layers of subsidiaries. RCN Corp. was a publicly traded company that provided telecommunications services in six geographical markets around the country. The business of RCN Corp. included two types of operations, those related to the company's cable business and those related to its fiber optic business (referred to in the record as the "metro" business). 

 In 2009, a private equity group known as ABRY Partners LLC (ABRY) came forward with a proposal to take RCN Corp. private. The shareholders of RCN Corp. agreed to cash out their ownership interests for fifteen dollars per share. It was important to ABRY, however, that RCN Corp. be restructured prior to consummation of the deal. Specifically, ABRY wanted the cable and metro businesses separated from each other even though the ownership interests in each would be acquired by groups of private investors, both controlled by ABRY. Under the plan, the cable business would be spun off, and the remains of RCN Corp. (encompassing the metro business) would be merged with a new entity named Yankee Metro Partners, LLC. 

 The precise manner in which the cable business was spun off from RCN Corp. is not entirely clear, in part because of complications that arose from the fact that at least four levels of subsidiaries were involved. [Note 4] In any event, it is undisputed that by the time the multilayered October 2010 closing transactions were 

 Page 806 

completed, RCN held the relevant § 39 assets, and would continue to do so during the relevant tax years.

 4. The filings for 2012, 2013, and 2014. As the owner of the relevant § 39 assets, RCN faced an obligation in March of 2011 to file a Form 5941 for the upcoming 2012 tax year based on the value of the relevant § 39 property as of January 1, 2011. RCN timely submitted its 2012 Form 5941, which was signed by its treasurer. However, the form was completed in a manner that was at odds with its instructions. Instead of providing the original installation cost information for each type of § 39 property in each municipality, RCN submitted information based on what it claimed were the costs it incurred in acquiring the relevant assets from RCN Corp. and its subsidiaries. In contrast to the ground-up approach taken by the commissioner, RCN adopted what could be labeled a "top-down" approach, under which the value of its § 39 property purportedly was derived from the transactions used to take RCN Corp. private. In fact, RCN submitted two different versions of its Form 5941 based on two different variations of such a top-down approach. One claimed that its § 39 property in Massachusetts, taken as a whole, was worth approximately $39.4 million, while the other claimed it was worth approximately $25.4 million. 

 The commissioner notified RCN that its Form 5941 was deficient. This led to significant wrangling over whether RCN had to supply the required information regarding original installation costs. RCN argued not only that its top-down approach provided a better estimate of actual market value, but also that it lacked the ability to provide the "prior owner's" original installation costs. [Note 5] Nevertheless, RCN eventually supplemented its Form 5941 filings by providing the requested information. However, the company

 Page 807 

 refused the commissioner's request that its treasurer attest that the new data provided was true to the best of his knowledge. 

 Based on the supplemental information that RCN provided, the commissioner used the DRC method to determine the value of RCN's § 39 property in the eighteen municipalities in which it was located. Taken together, the total value of all of RCN's § 39 property set by the commissioner for tax year 2012 came to approximately $154.8 million. In tax years 2013 and 2014, the process of submission and resubmission largely repeated itself, with the commissioner's resulting DRC valuation generating numbers in the same general range.

 RCN filed fifty-three petitions with the board challenging the valuations in each of the municipalities for each of the three tax years as "substantially higher" than the actual value. [Note 6] Five municipalities filed cross petitions challenging the valuations as too low in one or more of the tax years, totaling eleven such petitions. The board consolidated all the petitions into a single proceeding. It then heard twenty days of testimony and admitted several hundred exhibits.

 As noted, the board declined the commissioner's invitation to dismiss RCN's petitions based on inadequacies in its completed Form 5941 submittals, but upheld the commissioner on the merits. [Note 7] The board explained its rulings in a thoughtful decisional memorandum totaling eighty-nine pages. Further specifics regarding the board's rulings are reserved for later discussion.

 Discussion. 1. Board jurisdiction. By statute, telephone companies are required to file tax returns allowing the commissioner to value their § 39 property. G. L. c. 59, § 41. The commissioner has broad authority to spell out what data telephone companies must provide in the required forms. See id. (requiring that returns "be in the form and detail prescribed by the commissioner and shall contain all information which he [or she] shall consider necessary to enable him [or her] to make the valuations required by [§ 39]"). The statute requires that the forms be "signed and

 Page 808 

 sworn to by [the company's] treasurer." Id.

 A telephone company that does not comply with its filing obligations faces potential forfeiture of its right to challenge the § 39 valuations that the commissioner made. See G. L. c. 59, § 41. Under the specific terms of the statute, the telephone company forfeits that right when it does not "make the return required." Id. However, forfeiture on that ground does not apply if "such company was unable to comply with such request for reasons beyond such company's control." Id. A company that, in completing the form, "makes any statement which is known to be false in a material particular" will also be barred from challenging the commissioner's § 39 valuations. Id. Here, the commissioner maintains that RCN's challenge is barred by both provisions. 

 When the commissioner made these same arguments to the board, the board disagreed with the commissioner's position, and made various findings in support of its ruling that it had jurisdiction to hear RCN's petitions. Specifically, the board found that RCN's filings "did not evidence the submission of information known by RCN to be false in a material particular," and it "found no evidence that the signed returns had not been filed in good faith." With respect to the failure by RCN's treasurer "to sign and swear to [the] original [installation] cost information" that RCN ultimately provided, the board concluded that this did not "deprive the signed Forms 5941 of their validity." 

 We are not unsympathetic to many of the arguments that the commissioner has made with respect to RCN's flouting its filing obligations. The commissioner's portrayal of RCN's initial Form 5941 submittals as facially deficient has significant force, and RCN's counterargument that Form 5941 and its instructions are ambiguous is not persuasive. In addition, RCN's contentions that it lacked the ability to collect the original installation cost data appear to enjoy little support in the record. [Note 8] 

 Nevertheless, it appears undisputed that, when pressed by the commissioner to do so, RCN supplemented its Form 5941 filings by submitting the information that the commissioner requested, and then, without apparent prejudice from RCN's tardiness, the commissioner used that information to make the valuations. In addition, as the board recognized, RCN was transparent about how it was approaching its Form 5941 submittals and about its 

 Page 809 

objections to the methodology employed by the commissioner. [Note 9] To be sure, even after it supplied the missing information, RCN refused to provide a separate signature from its treasurer attesting to that information. But the commissioner has not suggested any reason to question the accuracy of the data that RCN eventually supplied, and while an attestation from a company's treasurer that submitted data was true "to the best of [his or her] knowledge" is important in general, the truth-seeking value it would have added here may be less so. Cf. McKenney v. Commission on Judicial Conduct, 377 Mass. 790, 796-797 (1979), S.C., 380 Mass. 263 (1980) (even where forms are required to be signed under pains and penalties of perjury, requirement that signatory have personal knowledge will not be inferred).

 Under the express terms of the statutory language on which the commissioner principally relies, forfeiture turns on whether RCN "ma[d]e the return required." G. L. c. 59, § 41. The commissioner suggests that as a matter of law, a taxpayer has failed to "make the return required" if the Form 5941 does not comply with the filing requirements that the commissioner has established. We agree with RCN that such a view has been rejected in cases analyzing analogous forfeiture provisions under other tax statutes. See, e.g., Commissioner of Revenue v. Exxon Corp., 407 Mass. 17, 18-21 (1990), and cases cited (affirming board jurisdiction over taxpayer appeal even where taxpayer's submittals plainly failed to satisfy filing requirements promulgated by commissioner pursuant to statutory authority). [Note 10] Such cases include language to the effect that the board can be deprived of jurisdiction only where the taxpayer failed to comply with a specific filing requirement that the statute, expressly or implicitly, made jurisdictional. See id. They recognize that although the commissioner has broad authority to set specific filing requirements, he or she has limited, if any, authority thereby to curb the board's jurisdiction to hear a taxpayer's appeal. See id.

 This is not to say that we endorse RCN's view that a telephone company per se can avoid forfeiting its right to challenge the

 Page 810 

 commissioner's § 39 valuations so long as it has submitted a signed Form 5941, regardless of how deficient that submittal may be. In other words, while we agree with RCN that the statute does not mandate forfeiture simply because the Form 5941 submitted does not comply with applicable filing requirements, it does not necessarily follow that the statute precludes forfeiture simply because a taxpayer has filed a signed Form 5941. 

 In the end, we need not resolve the extent of the board's authority to determine, on a case-by-case basis, that it lacks jurisdiction to hear a telephone company's appeal based on omissions in the company's Form 5941, because we conclude that the board properly exercised its jurisdiction here. At the commissioner's urging, RCN largely cured any deficiencies in its initial submittals, whether such deficiencies are viewed as material omissions or affirmative misstatements. In the circumstances presented, we conclude that the board did not err in entertaining RCN's substantive challenges to the commissioner's § 39 valuations. [Note 11] 

 One additional point bears noting. We disagree with the commissioner's position that the absence of any evidence that RCN acted in bad faith in submitting its returns (as the board concluded in an unchallenged finding) is irrelevant. It is true that a taxpayer's good faith cannot excuse a taxpayer's conduct and supply the board with jurisdiction where the taxpayer failed to comply with a foundational procedural requirement such as submitting an abatement application. See Assessors of Boston v. Suffolk Law Sch., 295 Mass. 489, 494 (1936) (no board jurisdiction despite taxpayer's apparent good faith). However, the board may consider a taxpayer's good faith when evaluating whether it has jurisdiction in the face of a taxpayer's "comparatively slight" noncompliance in completing the applicable tax form. Assessors of Quincy v. Boston Consol. Gas Co., 309 Mass. 60, 69-70 (1941) (board had jurisdiction notwithstanding taxpayer's failure to provide required information). See Trustees of Thayer Academy v. Assessors of Braintree, 232 Mass. 402, 407 (1919) (noting that "appellant's failure of exact compliance with the provisions of the [applicable tax] statute was not willful").

 Page 811 

 2. Merits. Much of the legal underbrush with respect to the merits has been cleared by the fact that the Supreme Judicial Court has approved the specific methodology that the commissioner uses to value § 39 property. See MCI, 454 Mass. at 641-646. It may well be that a telephone company theoretically could marshal evidence sufficient to prove that the commissioner's approved DRC methodology nevertheless substantially overvalued § 39 property in a particular instance. According to RCN, it made that very showing here based on its top-down approach that relied on an actual market sale. In essence, RCN argues that no matter how sophisticated and defensible the commissioner's DRC methodology otherwise might be, it must give way when an actual sale between a willing buyer and a willing seller provides direct proof of what the relevant assets are worth. See First Nat'l Stores, Inc. v. Assessors of Somerville, 358 Mass. 554, 560 (1971) (actual sales generally provide "strong evidence of fair market value, for they represent what a buyer has been willing to pay to a seller for a particular property"). Nevertheless, for the reasons set forth below, we accept the board's conclusion that RCN failed to carry its burden of proof that the commissioner's methods substantially overvalued RCN's § 39 property in the eighteen municipalities at issue.

 We turn first to a threshold issue raised by the commissioner and highlighted by the four municipal assessors participating in this appeal (participating assessors). See note 7, supra. As they point out, the statute focuses on the actual value of the § 39 property in each municipality in which such property lies. It therefore was RCN's burden to demonstrate that the values determined for the particular property lying in each of the municipalities were substantially too high. Notwithstanding that obligation, RCN focused instead on the aggregate value of its § 39 property in the eighteen municipalities taken as a whole. RCN made minimal efforts to apportion that value to the individual municipalities. The testimony of the one witness who touched on this issue is not even clear about what apportionment methods he was endorsing, and in any event, his testimony appears divorced from an analysis of what § 39 property actually lay in each municipality. We agree with the commissioner and participating assessors that this deficiency is relevant to the board's determination of whether RCN met its burden of proof. Nevertheless, we do not view RCN's failure to take a municipality-by-municipality approach as per se fatal. It might be that in a particular case, a 

 Page 812 

telephone company could demonstrate that its § 39 property as a whole was so overwhelmingly overvalued that it likely was overvalued in each of the respective municipalities. This is not, however, such a case.

 RCN seeks to portray its top-down approach as resting on a simple and straightforward arms-length sale. However, even apart from the complexities injected by the multiple layers of subsidiaries involved, little about the closing transactions at issue here, or the analysis that RCN applies to those transactions, is simple and straightforward. RCN's top-down approach seeks to derive the value of the relevant § 39 property from the over-all sale of RCN Corp.'s stock when that entity was taken private. Doing so involves multiple layers of analytical steps that -- especially when taken together -- justified the skepticism with which the board approached RCN's showing. The difficulty of figuring out the value of physical equipment from sales of telecommunications businesses is the type of problem that led the commissioner to develop the DRC methodology in the first place. 

 None of this is to say that RCN's top-down approach lacks any merit, or that all the criticisms levied against RCN's methods are justified. We note, for example, that RCN may be on solid ground in arguing that the $1.25 billion that the shareholders of RCN Corp. received in 2010 established the over-all market value of that corporation when it was taken private. Indeed, the commissioner acknowledged as much at oral argument. Moreover, while the commissioner is correct that the percentage of the total amount paid for RCN Corp. stock that was attributed to the cable side of the business acquired by RCN was not itself set through an arms-length transaction, [Note 12] there is at least some force to RCN's argument that the percentage that was assigned was accurately determined by market forces. However, even assuming arguendo that RCN's estimate of the market value of RCN Corp.'s cable business as a whole was reasonably accurate, several layers of additional steps are needed to derive from that figure the supposed market value of the actual physical § 39 property in Massachusetts, much less the value of the particular § 39 property lying in each of the relevant eighteen municipalities at issue. Each added step in the process lends additional imprecision. Because

 Page 813 

 the value of a business's tangible property is but one factor affecting the value of the business as a whole, seeking to use the over-all enterprise value of an entity to determine the market value of a subset of its tangible assets is a potentially perilous undertaking.

 Whether RCN ultimately carried its burden of demonstrating that the commissioner substantially overvalued its § 39 property in each of the municipalities principally turns on questions of fact. Our role as a reviewing court is not to second guess the board's evaluation of the facts, but to defer to "the board's findings so long as they are supported by substantial evidence and a correct application of the law." MCI, 454 Mass. at 641, quoting Bell Atl. Mobile of Mass. Corp. v. Commissioner of Revenue, 451 Mass. 280, 283 (2008). In the end, RCN's vigorous protests that the commissioner substantially overvalued its § 39 property are reminiscent of the sheep that provides "more cry than wool." [Note 13]

 To the extent that RCN argues that reversal is required because the board's decision is infected by errors of law, we are unpersuaded. RCN makes an extravagant claim, not accepted by the board that the commissioner's approach violates language in G. L. c. 59, § 41, that directs that § 39 valuations be based "so far as is possible, [on] the situation of the company and its property on January first of the year when made." That otherwise unexceptional statutory language, which focuses on timing, hardly requires that the commissioner's ground-up approach must be put aside in favor of RCN's top-down approach. As noted, the Supreme Judicial Court already has endorsed the methodology used by the commissioner. See MCI, 454 Mass. at 641-646. Moreover, even if we were viewing the issue as an original matter, the board's interpretation of the language on which RCN seeks to rely is reasonable, and we therefore are entitled to give that interpretation deference. See id. at 641. See generally Goldberg v. Board of Health of Granby, 444 Mass. 627, 633 (2005), quoting Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgt. Bd., 421 Mass. 196, 211 (1995) ("if the Legislature has not addressed directly the pertinent issue, we determine whether the agency's resolution of that issue may 'be reconciled with the governing

 Page 814 

 legislation'"). [Note 14]

 RCN points to testimony that if it had to replace its § 39 property today, it would install a different system than the one in place when the valuations were being performed. For example, there was testimony that RCN would reduce the number of so-called "hubs" on which its network relies. RCN argues that using reproduction costs instead of replacement costs overvalued what the current system was worth. It relies on case law that recognizes that at some point, "special purpose property" may become so dated that reproduction costs cease to be a useful measure. See Commonwealth v. Massachusetts Turnpike Auth., 352 Mass. 143, 148-149 (1967) (Massachusetts Turnpike Auth.). [Note 15] However, RCN failed to substantiate that this point had been reached here; for example, there is evidence that RCN portrayed its system as "[s]tate of the art." In addition, RCN failed to provide proof of how its suggested "replacement cost adjustment" in fact would affect the value of its particular § 39 property in each municipality. 

 RCN also maintains that, as a matter of law, the board was required to accept opinion testimony by Michael Thomas Sicoli as to the market value of RCN's § 39 assets. Sicoli had been the chief financial officer (CFO) of RCN Corp., the company that formerly had held the § 39 property through several layers of subsidiaries. The board concluded that even if Sicoli, as CFO of RCN Corp., had gained "knowledge of and familiarity with [RCN's § 39] property, the opinion of value he offered was unsupported by a recognized valuation methodology and did not provide evidence of value." Pointing to case law recognizing the ability of owners of real estate or other tangible property to offer lay opinions as to its value, see, e.g., Winthrop Prods. Corp. v. 

 Page 815 

Elroth Co., 331 Mass. 83, 85 (1954), RCN contends that the board committed legal error in declining to credit Sicoli's testimony. We disagree. As a general matter, the board has significant latitude in determining what weight to assign to the evidence before it. See General Elec. Co. v. Assessors of Lynn, 393 Mass. 591, 602 (1984) (decision by board as to what weight to afford opinion testimony on value is reviewable only for abuse of discretion). Moreover, § 39 property is not real estate or simple personal property such as the inventory at issue in Winthrop Prods. Corp., 331 Mass. at 83-84. Rather, as the case law recognizes, § 39 property is a highly specialized species of property that does not lend itself to being valued in the usual manner. See MCI, 454 Mass. at 638-639. We discern no abuse of discretion or other error of law in the board's declining to credit Sicoli's testimony. 

 One additional legal argument that RCN raises warrants specific comment. During the board's proceedings, citing G. L. c. 268A, § 9, RCN sought to disqualify the commissioner's expert based on an alleged conflict of interest. That expert was Sansoucy, the person on whose work the commissioner relied in creating the DRC system. RCN argued that Sansoucy should have been disqualified from testifying on the commissioner's behalf because during the periods he worked for the Commonwealth, he separately had been engaged by various municipalities to work on valuation issues in violation of the State ethics law, G. L. c. 268A. After RCN first raised the issue, Sansoucy formally apprised the commissioner and the State Ethics Commission of the potential conflict of interest, and the commissioner expressly approved Sansoucy's continuing to work on this case. See G. L. c. 268A, § 6 (recognizing appointing authority's option to "make a written determination that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the [C]ommonwealth may expect from the employee, in which case it shall not be a violation for the employee to participate in the particular matter"). RCN nevertheless argues that this process did not fully cure the problem, because some of Sansoucy's work on the case predated his disclosure and the commissioner's blessing. It also argues that, notwithstanding our decision in Nantasket Beachfront Condominiums, LLC v. Hull Redev. Auth., 87 Mass. App. Ct. 455, 466 (2015), it can seek disqualification of Sansoucy even in the absence of any formal ethics enforcement proceeding before the State Ethics Commission or a court. We need not address 

 Page 816 

such issues further because, in any event, RCN has not demonstrated such significant taint as would be needed to render the board's declining to disqualify Sansoucy an error of law. 

 Conclusion. We affirm the board's decision that it had jurisdiction to entertain RCN's petitions challenging the valuations that the commissioner has made of its § 39 property, and we affirm the board's denial of those petitions on the merits.

Decision of the Appellate Tax Board affirmed.

FOOTNOTES
[Note 1] Board of assessors of Boston, board of assessors of Newton, board of assessors of Brookline, and board of assessors of Lexington. 

[Note 2] The statute was enacted in 1915. See St. 1915, c. 137. The term "telephone company" was not defined by the Legislature then, nor is it today. Needless to say, the last century has occasioned significant changes in telecommunications technology and in the nature of the telecommunications industry. Although there once was some doubt whether the taxpayer now before us was a telephone company subject to the special procedures set forth in the statute, that doubt since has been resolved. See RCN-BecoCom, LLC v. Commissioner of Revenue, 443 Mass. 198, 203-206 (2005) (rejecting commissioner's position that RCN-BecoCom, LLC, was not telephone company subject to G. L. c. 59, § 39). 

[Note 3] In general, there are three recognized ways of determining the value of commercial property: (1) the "market study method," which compares the property to other property recently sold, (2) "'income capitalization,' which calculates the present value of the income that property will produce," and (3) the DRC method. MCI, 454 Mass. at 638, quoting Blakeley v. Assessors of Boston, 391 Mass. 473, 477 (1984), and Correia v. New Bedford Redev. Auth., 375 Mass. 360, 362 (1978). Although the first two methods generally are "preferred," these "may be unavailing 'where the special character of the property makes it substantially impossible to arrive at value on the basis of capitalized net earnings or on the basis of comparable sales.'" MCI, supra, quoting Blakeley, supra. In such circumstances, the commissioner is authorized to use the DRC method. 

[Note 4] RCN maintains that it acquired the Massachusetts portion of the cable business in an asset sale from an existing lower-level subsidiary of RCN Corp. known as RCN BecoCom Inc., and -- as RCN confirmed at oral argument -- RCN BecoCom Inc. and RCN were merged. Confusingly, RCN also asserts that the Massachusetts cable assets were included in a sale of RCN Corp.'s cable assets as a whole, with that transaction taking place between an entity known as RCN Telecom Services, LLC, and one known as Yankee Cable Acquisition LLC. How the two nominal asset sales involving the Massachusetts cable assets purportedly relate to each other has not been made clear to us. 

[Note 5] The astute reader might wonder why RCN could not simply have used the original installation cost information supplied to the commissioner on Form 5941 for prior tax years, with limited updates to address newly installed equipment. As the commissioner acknowledges, however, the fact that RCN is a limited liability company, and not an ordinary corporation, means that somewhat different rules apply with respect to what is subject to § 39, thereby complicating the ability of an entity in RCN's position to rely on wholesale incorporation of the historical data. 

[Note 6] RCN did not challenge one of the § 39 valuations made in one of the municipalities in one of the tax years. 

[Note 7] The subset of municipal assessors who had filed cross petitions informed the board that they were "rest[ing] on the presumed validity of the certified values." In other words, these assessors abandoned their claims that the valuations done by the commissioner were too low. Assessors from four municipalities have participated in this appeal in support of the commissioner's position. The assessors from the other fourteen municipalities have agreed to be bound by the result of the board's decision and any appeals. 

[Note 8] It appears that RCN continued to have access to relevant staff and files. 

[Note 9] This appears to be the basis of the board's finding that the commissioner had not demonstrated that RCN had acted in bad faith. 

[Note 10] Nothing in our recent opinion in Veolia Energy Boston, Inc. v. Assessors of Boston, 95 Mass. App. Ct. 26, 30-31 (2019), is to the contrary. There, the taxpayer had failed to file any timely application for an abatement in accordance with the terms of the statute, thus depriving the assessors and the board of jurisdiction to consider its request. 

[Note 11] As part of its analysis, the board stated that while the commissioner plainly had authority to require RCN to supplement its signed but otherwise deficient returns, "the statute did not allow the [c]ommissioner simply to reject them." To be clear, we note that we do not reach that question. In any event, we caution taxpayers that they ignore the commissioner's filing requirements at their peril. 

[Note 12] Although the RCN Corp. shareholders who cashed out their interests were, by definition, parties to the closing documents, they presumably had no interest in how much of the sales proceeds should be attributed to each side of RCN Corp.'s business. 

[Note 13] According to Bartlett's Familiar Quotations, the earliest recorded variation of this expression was made in the Fifteenth Century by John Fortescue, who wrote "Moche Crye and no Wull" in De Laudibus Legum Angliae, c. 10 (1470). Bartlett's Familiar Quotations 133 (J. Kaplan ed., 16th ed. 1992). 

[Note 14] For similar reasons, we are unpersuaded by RCN's suggestion that -- because of competitive disadvantages that it claimed to face compared to other telephone companies -- the commissioner overvalued its § 39 property because an additional "obsolescence adjustment" was not made. 

[Note 15] As the court said there: 

"A different situation exists, however, where special purpose structures are very greatly out of date, are no longer well fitted to their particular use, and would not be reproduced by any prudent owner. In such a case, evidence of adjusted reproduction cost will be irrelevant, for it is difficult, even for an expert, to estimate suitable allowances for physical depreciation and obsolescence of such an obsolete structure." 

Massachusetts Turnpike Auth., 352 Mass. at 149.

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.